**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| CITY OF BALTIMORE, *ex rel*. Ebony Thompson,<br>*Plaintiff*,<br>v.<br>QCX LLC, BLOCKRATIZE INC., and QC TECH LLC,<br>*Defendants*. | Case No.: ___________________<br>(Removed from the Circuit Court for Baltimore City, Case No. C-24-CV-26-005535) |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1332, 1441(a), 1442(a), and 1446, Defendant QCX LLC ("Polymarket US"), by and through its attorneys, hereby removes the above-captioned action from the Circuit Court for Baltimore City, Maryland, to the United States District Court for the District of Maryland. All named Defendants consent to this removal.

This Notice of Removal is not intended to constitute and should not be construed as constituting a general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action whether in state or federal court, including, but not limited to, improper service of process and/or lack of personal jurisdiction. Defendants reserve the right to amend or supplement this Notice of Removal.

In support of removal, Defendants state as follows:

**BACKGROUND**

1. Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are an important component of modern, federally regulated financial

markets. Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports. Through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2. Polymarket US operates a federally licensed designated contract market that offers event contracts. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the payoff "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,669 (May 7, 2008). Polymarket US offers event contracts subject to and in compliance with the CFTC's regulatory oversight and federal law.

3. The CFTC itself has confirmed through litigation, amicus briefs, and public statements that event contracts traded on designated contract markets fall squarely within its exclusive federal authority. *See, e.g.,* Complaint, *United States v. Arizona,* No. 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. 1 ("CFTC Arizona Compl."); Amicus Br. of CFTC, *KalshiEX LLC v. Schuler,* No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 ("CFTC Sixth Cir. Amicus Br."). Two courts have granted a request from the CFTC to enjoin state interference with event-contract markets. *See United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026); *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *5–8 (D. Ariz. May 5, 2026). And the Third Circuit, the only federal court of appeals to decide this issue on the merits, agreed that regulatory

authority over these contracts belongs to the CFTC, not the States. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

4. The City of Baltimore has chosen to invade the CFTC's exclusive jurisdiction anyway. It sued Polymarket US in state court, seeking penalties and an order enjoining Polymarket US's federally regulated operations in the City of Baltimore. *See* Complaint (attached hereto as Exhibit 1). That order would directly conflict with federal law and intrude upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

5. CFTC-licensed exchanges like Polymarket US are subject to exclusive federal oversight, not municipal regulation. Allowing municipal regulators to shut down derivatives trading by rushing to state courts would fracture the uniform national framework that Congress designed and that the CFTC alone may police.

6. This Court has jurisdiction under 28 U.S.C. § 1332 because the City of Baltimore and Defendants are citizens of different states and because Plaintiff seeks more than seventy-five thousand dollars ($75,000). First, complete diversity exists because the City of Baltimore is a citizen of Maryland, and all Defendants are citizens of Delaware and New York. Second, Plaintiff seeks "over $100,000" in monetary damages exclusive of "Attorney's Fees, Interest, or Court Costs." *See* Case Information Report (attached hereto as Exhibit 2) at 2. Plaintiff seeks "civil penalties of up to $1,000" for each violation of the Consumer Protection Ordinance "and for each day that a violation was committed," Compl. ¶¶ 101, 113, alleges that "thousands of Baltimore consumers" have traded on the platform, *id*. ¶¶ 2, 9, and cites purported violations from several months ago, *see*, *e.g.*, *id*. ¶¶ 77, 82, 85.

7. This Court also has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. In operating a designated contract market, Polymarket US acts as a "self-regulatory organization" exercising delegated authority from the CFTC. As a self-regulatory organization, Polymarket US does not merely comply with the federal regulatory regime. It is a "front-line regulator[]" that assists the CFTC by performing regulatory functions the federal agency itself would otherwise carry out. CFTC Staff Advisory at 1, CFTCLTR No. 26-08 (Mar. 12, 2026) ("*Prediction Markets Advisory*"). And those functions—regulating market access, certifying event contracts for listing, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Because Plaintiff's state-court lawsuit seeks to interfere with the federal government's exclusive authority and the system of self-regulation Congress created, Polymarket US is entitled to have its federal preemption defense resolved in federal court.

8. Finally, this Court has jurisdiction under 28 U.S.C. § 1331. Plaintiff's purported municipal-law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA. Plaintiff's claims expressly raise the question whether the event contracts Polymarket US offers are legal, which necessarily turns on disputed questions about the meaning and scope of the CEA. For example, to succeed on its claims, Plaintiff must establish that Polymarket US's sports-related event contracts are illegal under the law governing their validity. This will require Plaintiff to grapple with the legality of the event contracts under the CEA. Again, this Court is the proper forum to resolve those questions of federal law.

## I. Federal Regulatory Authority

9. Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute

"swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); *see*, *e.g.*, CFTC Arizona Compl. ¶¶ 5, 31, 35; *United States v. Minnesota*, 2026 WL 2150211, at *11–12.

10. On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

11. When it comes to exchange-traded event contracts, Congress could not have been clearer: The CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

12. Polymarket US operates in compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

## II. The City of Baltimore's Suit Directly Conflicts With Federal Law

13. Despite this exclusive federal regime, the City of Baltimore, by and through its City Solicitor, Ebony Thompson of the Baltimore City Law Department, filed suit against Polymarket US on August 13, 2026, asserting that federally regulated event contracts constitute illegal "sports wagering" under Maryland law. Compl. ¶ 3.

14. Plaintiff's theory is that Polymarket US's activities constitute sports wagering under Maryland law such that Polymarket US cannot legally operate in Maryland absent a sports-

wagering license issued by the Maryland Lottery and Gaming Control Commission. *Id.* ¶¶ 3, 25, 37–40, 62–69. And, Plaintiff observes, national, CFTC-regulated derivatives exchanges like Polymarket US "operate outside" this "licensing and taxation framework." *Id.* ¶¶ 35–36.

15. Plaintiff claims Defendants violated the Baltimore Consumer Protection Ordinance ("CPO") through deceptive trade practices by conveying the "false, deceptive, and misleading impression that [Polymarket US's] sports-event contracts . . . may lawfully be purchased and traded in Maryland" and by failing to disclose material facts concerning who trades on Polymarket US and how. *Id.* ¶¶ 90–101; Baltimore City Code Art. 2, §§ 4-1, 4-2, 4-3; Md. Code Ann., Com. Law § 13-301. Plaintiff further claims Defendants' "unauthorized offering and facilitation of sports wagering in Baltimore" is an unfair and abusive trade practice under the CPO because it is against public policy. Compl. ¶¶ 102–13; Baltimore City Code Art. 2, §§ 4-1, 4-2; Md. Code Ann., Com. Law § 13-105.

16. Plaintiff requests (a) the maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each purported violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4-2; (b) injunctive relief mandating that Defendants cease operating their alleged unauthorized sports wagering platforms in the City of Baltimore and prohibiting them from accepting transactions from Baltimore residents; (c) disgorgement of supposed ill-gotten gains derived from Defendants' unlawful practices; (d) restitution to Baltimore consumers supposedly harmed by Defendants' unlawful practices; and (e) such other relief as may be available and appropriate under the law or in equity. Compl. p. 26.

17. Polymarket US will demonstrate that Plaintiff's Complaint fails as a matter of law because sports-related event contracts may be lawfully purchased and traded in Maryland on a designated contract market. Polymarket US's event contracts are not subject to State regulation

as "gambling" or "wagering." Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts. 7 U.S.C. § 2(a)(1)(A); *see* CFTC Sixth Cir. Amicus Br. at 1. It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7 U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

18. The City of Baltimore's attempt to override and usurp the CFTC's exclusive federal authority through municipal code and state-law declarations, injunctions, and monetary damages conflicts with the regime Congress established.

**FIRST GROUND FOR REMOVAL: DIVERSITY JURISDICTION**

19. This Court would have original jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because it is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. *Gainer v. Lynn*, 2025 WL 1068052, at *2 (D. Md. Apr. 9, 2025). The action is therefore removable under 28 U.S.C. §§ 1441(a) and (b).

20. ***First***, there is complete diversity of citizenship between the parties. To establish diversity jurisdiction, "no defendant may be a citizen of the same state as any plaintiff." *Pebbles v. Corp. Hollywood*, 2025 WL 1079533, at *1 (D. Md. Apr. 10, 2025).

21. Plaintiff is a citizen of Maryland. Plaintiff is a municipal corporation organized under Maryland law. 1796 Md. Laws 256; Md. Const. art. XI, § 9; *see also Moor v. Alameda Cnty.*, 411 U.S. 693, 717–18 (1973) ("'[I]t is well settled that for purposes of diversity of

citizenship, political subdivisions are citizens of their respective States[.]'"). The City is suing in its own name and on its own behalf to enforce and recover under its own municipal ordinance, not on behalf of the State or as an arm of the State. Accordingly, the City of Baltimore is a citizen of Maryland.

22. Defendant QCX LLC is a citizen of Delaware and New York. For diversity purposes, a limited liability company is a citizen of every state in which any of its members is a citizen. *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC,* 636 F.3d 101, 103 (4th Cir. 2011). QCX LLC is a Delaware limited liability company. Its sole member is QCL Quad Code USA Corporation, a corporation organized under the laws of Delaware with its principal place of business in New York, New York. QCX LLC is therefore a citizen of Delaware and New York and is not a citizen of Maryland.

23. Defendant Blockratize Inc. is a citizen of Delaware and New York. Blockratize Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

24. Defendant QC Tech LLC is a citizen of Delaware and New York. QC Tech LLC is a Delaware limited liability company. Its sole member is QCL Quad Code USA Corporation, a corporation organized under the laws of Delaware with its principal place of business in New York, New York. QC Tech LLC is therefore a citizen of Delaware and New York and is not a citizen of Maryland.

25. Complete diversity accordingly exists under 28 U.S.C. § 1332: Plaintiff is a citizen of Maryland, and each Defendant is a citizen of Delaware and New York. No Defendant is a citizen of Maryland.

26. ***Second***, the amount in controversy exceeds $75,000. Although Defendants deny that Plaintiff is entitled to any relief, the relief demanded in the Complaint places well over $75,000 in controversy, exclusive of interest and costs. By Plaintiff's own estimate in the Case Information Report it filed with its Complaint in the state court, Plaintiff seeks more than $100,000 in civil penalties exclusive of "Attorney's Fees, Interest, or Court Costs." Ex. 2 at 2.

27. Additionally, in the Complaint, Plaintiff asserts that Defendants are liable for violating Baltimore's CPO, Baltimore City Code Art. 2, § 4, and seeks civil penalties, injunctive relief, restitution, and disgorgement. *See* Compl. Demand for Relief. Plaintiff seeks "the maximum amount of statutory penalties available," Compl. Demand for Relief ¶ a, which Plaintiff alleges are "up to $1,000" "[f]or each violation of the CPO, and for each day that a violation was committed," Compl. ¶¶ 101, 113 (citing Balt. City Code Art. 2, § 4-4, which authorizes criminal penalties, rather than § 4-3, which authorizes civil penalties). The Complaint alleges that Defendants' platform has been continuously available and used by "thousands of Baltimore consumers." *Id.* ¶¶ 2, 9. And the Complaint discusses Polymarket US's operations going back months. *See*, *e.g.*, *id.* ¶¶ 77, 82, 85. Per-day, per-violation penalties on those allegations alone exceed $75,000.

28. Plaintiff also seeks disgorgement of Defendants' allegedly "ill-gotten gains" and restitution to Baltimore consumers. Compl. Demand for Relief ¶¶ c, d. This apparently encompasses all revenue attributable to Baltimore users of the platform over the entire period at issue—an amount that, on the Complaint's own allegations concerning the volume of trading by Baltimore consumers, exceeds $75,000. *See In re Microsoft Corp. Antitrust Litig.,* 127 F. Supp. 2d 702, 720–21 (D. Md. 2001) (finding diversity jurisdiction appropriate when plaintiff claims disgorgement in addition to claims for damages).

29. Plaintiff also seeks a permanent injunction "mandating that Defendants cease operating" their platform in the City of Baltimore and "prohibiting them from accepting transactions from Baltimore residents." Compl. Demand for Relief ¶ b. In the Fourth Circuit, "the value of an injunction for amount in controversy purposes" is "the larger of . . . the injunction's worth to the plaintiff or its cost to the defendant." *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010). The cost to Defendants of the demanded injunction—including forgone revenue from Baltimore users and the cost of identifying and excluding them from the platform—would far exceed $75,000.

30. Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, this Court has original jurisdiction under 28 U.S.C. § 1332 and this action may be removed under 28 U.S.C. § 1441.

**SECOND GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

31. The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court. As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

32. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties

specifically required or strictly caused the challenged conduct." *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1060 (2026). The Fourth Circuit likewise applies Section 1442 broadly and recognizes that "the ordinary presumption against removal does not apply." *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) (quotation omitted); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254–59 (4th Cir. 2017).

33. Federal officer removal "is an exception to the 'well-pleaded complaint rule,'" allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted). The statute provides "a federal forum for a federal defense," *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016), and courts credit the defendant's "theory of the case" for jurisdictional purposes, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999). A private defendant need only plausibly allege that it acted under a federal officer, that the claims are for or relating to acts under color of federal authority, and that it has a colorable federal defense. *Sawyer*, 860 F.3d at 254–59; *Maryland v. 3M Co.*, 130 F.4th 380, 390–95 (4th Cir. 2025).

34. Polymarket US satisfies those requirements because (1) it is a "person" acting under the CFTC and its officials, (2) this suit is "for or relating to" acts Polymarket US takes under color of that federal authority, and (3) Polymarket US has a "colorable federal defense." *Plaquemines*, 146 S. Ct. at 1057–58; *Sawyer*, 860 F.3d at 254–59. Because Section 1442 authorizes removal of the "civil action," once those requirements are met, the entire action belongs in federal court. 28 U.S.C. § 1442(a)(1).

35. Notably, Section 1442 does not require Polymarket US to show that the CFTC or any CFTC official specifically directed the precise transaction, event-contract listing, or state-specific access decision Plaintiff challenges. The statute separates two questions: whether

Polymarket US acts under a federal officer, and whether this suit is "for or relating to" acts taken under color of that federal authority. *Plaquemines* confirms that the second requirement is satisfied by a non-tenuous relationship between the challenged conduct and the defendant's federal duties; it does not collapse the acting-under inquiry into a requirement that the agency specifically command the challenged act. 146 S. Ct. at 1060–61. The Fourth Circuit likewise rejects a "specific government direction" requirement for the challenged conduct. *Sawyer*, 860 F.3d at 258–59. Here, Polymarket US acts under the CFTC when it performs federally delegated functions as a designated contract market, and Plaintiff's suit relates to those functions because it targets market access, contract listing, trading, surveillance, compliance, enforcement, dispute resolution, and market safeguards.

36. ***First***, Polymarket US is a "person acting under" the CFTC and its officials. 28 U.S.C. § 1442(a)(1). A limited liability company is a "person" under the removal statute. 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). And Polymarket US acts under the CFTC because it "assist[s]" and "help[s] carry out[] the duties [and] tasks of the" agency. *Watson*, 551 U.S. at 152. The Fourth Circuit has repeatedly recognized that private entities act under federal officers when they perform work that assists the federal government in carrying out federal functions. *Sawyer*, 860 F.3d at 255–57; *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 93–96 (4th Cir. 2019).

37. Polymarket US operates its designated contract market subject to the CFTC's direction and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Watson*, 551 U.S. at 153. Polymarket US does more than merely comply with the CEA's highly detailed regulatory scheme; as a contract market, it exercises delegated federal

authority to "promulgate[] rules and regulations" governing market participants. *Merrill Lynch*, 456 U.S. at 382.

38. To operate as a designated contract market, Polymarket US is charged with establishing and enforcing various rules to carry out the CEA's objectives, all under the CFTC's oversight. For example, Polymarket US's conduct and rules must comply with the CEA's 23 core principles and all CFTC rules governing market access, contract design, surveillance, enforcement, dispute resolution, financial safeguards, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). It may suspend or revoke a contract market's designation, 7 U.S.C. §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for injunctive relief, rescission, trading bans, registration bans, and other relief, *id.* § 13a-1.

39. The relationship between Polymarket US and the CFTC goes well beyond the fact of federal regulation alone to include tasks the federal government would otherwise perform. The CEA creates "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." 7 U.S.C. § 5(b). CFTC regulations define contract markets as "self-regulatory organization[s]." 17 C.F.R. § 1.3; *see also* 17 C.F.R. § 1.52(a)(2).

40. Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to adopt, implement, and enforce regulatory protections—authority that, without contract markets, the CFTC would otherwise exercise itself. *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022). Contract markets perform a

variety of "regulatory functions to safeguard the integrity of the derivatives markets that the CFTC would otherwise have to undertake." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 2018 WL 1635851, at *1 (N.D. Ill. Apr. 5, 2018), *aff'd*, 933 F.3d 882 (7th Cir. 2019); *see also Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 231 (6th Cir. 1980) (discussing "the regulatory efforts of the exchanges in curbing unfair trading practices"), *aff'd*, 456 U.S. 353 (1982); *Prediction Markets Advisory* at 1 (contract markets have "self-regulatory obligations for the contract markets they operate"); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority "delegated by the SEC"); *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (similar); *Howes v. Fin. Indus. Regul. Auth., Inc.,* 2023 WL 2213688, at *5 (D. Md. Feb. 24, 2023) (similar).

41. That delegated authority is what makes this case unlike one involving mere regulation or ordinary compliance with federal law. *See Watson*, 551 U.S. at 153–54. A designated contract market does not merely submit to federal rules. It is required to adopt, monitor, apply, and enforce rules governing market participants—regulatory work that Congress assigned to contract markets under CFTC oversight and that the CFTC would otherwise have to perform itself. *See* 7 U.S.C. §§ 5(b), 7(d); *Sawyer*, 860 F.3d at 255–57; *see L-3*, 926 F.3d at 93–96.

42. Put differently, Polymarket US is not invoking federal officer removal merely because it is regulated by the CFTC. It invokes removal because Congress and the CFTC have assigned contract markets day-to-day responsibility for administering a federally supervised market structure. The CFTC retains ultimate authority, but contract markets perform the front-line work of operating the market, policing access, setting and enforcing trading rules, listing contracts through the federal submission/self-certification process, resolving disputes, disciplining

participants, and protecting the market and market participants. That is at least as close to federal work as the contractor relationships in *Sawyer* and *L-3*—and the nexus here is stronger because Plaintiff attacks the very market functions Congress placed under CFTC oversight.

43. In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions. For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2).

44. A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4).

45. A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12). To that end, it also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses." *Id.* § 7(d)(10).

46. These rules, the CFTC has explained, "play" an "important role . . . in promoting the integrity of derivatives markets." *Prediction Markets Advisory* at 2.

47. Polymarket US also performs federally supervised rule- and product-listing functions. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the rule complies with federal law and the CFTC's requirements.

7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

48. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

49. The CFTC's retained authority confirms the "acting under" relationship. Federal agencies necessarily retain ultimate authority over delegated regulatory functions, and Section 1442 does not require a private entity to exercise unfettered governmental power. The CFTC's authority to review, stay, amend, prohibit, or require changes to the rules and event-contract listings on a designated contract market—and to suspend or revoke a contract market's designation—shows that Polymarket US performs federal market-regulatory work under federal subjection, guidance, and control. That is the relationship *Watson* describes as "acting under": assistance to a federal superior in carrying out federal tasks, not independent private action. *Watson*, 551 U.S. at 151–54; *Sawyer*, 860 F.3d at 255–57.

50. Once contracts are listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id.* § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id.* § 7(d)(12)(B).

To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c).

51. In all of these respects, a designated contract market exercises authority delegated by the federal government, "perform[ing] a job that . . . the Government itself would have had to perform." *Watson*, 551 U.S. at 154. Because Polymarket US's actions involve "an effort to assist, or to help carry out, the duties or tasks of the federal superior," the CFTC, Polymarket US "'act[s] under'" that agency. *Id.* at 152 (emphasis omitted); *Sawyer*, 860 F.3d at 255–57.

52. ***Second***, Plaintiff's lawsuit is "for or relating to" actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC. The "for or relating to" element "sweeps broadly." *Plaquemines*, 146 S. Ct. at 1060. "One thing can relate to another even if the connection is indirect," and "even without a strict causal relationship." *Id.* (internal quotation marks omitted). The Fourth Circuit has held that the 2011 amendment "broaden[ed] the universe of acts" supporting removal, such that there need be only a "connection or association" between the challenged conduct and federal authority. *Sawyer*, 860 F.3d at 258 (cleaned up); *Maryland v. 3M*, 130 F.4th at 388–92. *Plaquemines* confirms that the defendant need not show that the federal government specifically required or strictly caused the challenged conduct. 146 S. Ct. at 1060. It is enough that the defendant plausibly alleges a close relationship between the challenged conduct and the performance of federal duties. *Id.* at 1060–61.

53. That requirement is easily satisfied here. Plaintiff does not challenge collateral commercial conduct remote from Polymarket US's federal role. Plaintiff challenges activity of the designated contract market itself: Polymarket US's offering and listing of federally regulated

event contracts, its provision of access to its federally regulated exchange, and the safeguards and rules through which it operates that exchange. Compl. ¶¶ 5–6, 10, 16, 37–40, 94–98, 107–11. In particular:

a. Federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," including by "establish[ing] and impartially enforc[ing] rules governing denials, suspensions, and revocations" of access, 17 C.F.R. § 38.151(b)–(c). But Plaintiff seeks to bar or condition access to Polymarket US's federally regulated market by residents of Baltimore. Compl. ¶ 112. On that basis, Plaintiff seeks to *alter* Polymarket US's terms of access. *Id.* ¶¶ 102–13.

b. Federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B). But Plaintiff takes issue with—and attempts to alter—the types of event contracts offered on Polymarket US's platform, alleging that certain contracts are illegal and offering them is unfair and abusive. Compl. ¶¶ 62–65, 71, 102–13.

c. Federal law authorizes Polymarket US, subject to comprehensive CFTC oversight, to submit or self-certify event contracts for listing and to offer those contracts on its federally designated contract market. But Plaintiff seeks to impose liability on Polymarket US based on its offering of event contracts anyway. Indeed, Plaintiff seeks injunctive relief in addition to civil penalties of up to $1,000 for each violation

based on Polymarket US's offering and facilitation of those event contracts. *Id.* ¶¶ 101, 107–13.

d. Federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its "rules prohibiting abusive trade practices on the contract market" and to "prevent manipulation" and "price distortion . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. §§ 7(d)(2)(A), 7(d)(4); *see also* 17 C.F.R. § 38.651 (requiring Polymarket US to "have and enforce rules that are designed to promote fair and equitable trading and to protect the market and market participants from abusive practices"). But Plaintiff disagrees with how Polymarket US has done so, claims that it lacks adequate consumer safeguards, and that its failure to disclose these alleged shortcomings is deceptive. Compl. ¶¶ 74–89, 97–98.

e. Federal law also requires Polymarket US to establish and enforce disciplinary procedures and to provide facilities for fair and equitable dispute resolution. 7 U.S.C. § 7(d)(13)–(14). But Plaintiff seeks to replace the federal framework with state gambling, licensing, consumer-protection, nuisance, or similar remedies and restrictions, including relief premised on the asserted illegality or inadequacy of Polymarket US's federally regulated market procedures. Compl. ¶¶ 19–30, 37–40, 62–69, 90–113, Demand for Relief ¶¶ a–e.

54. In other words, the connection "between [Polymarket US's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines*, 146 S. Ct. at 1061. Indeed, the suit targets the precise federally delegated

functions that make a contract market a contract market: market access, contract listing, rulemaking, surveillance, and enforcement under CFTC oversight.

55. ***Third***, Polymarket US has a "colorable federal defense." *Plaquemines*, 146 S. Ct. at 1057–58. Plaintiff's claims are preempted by federal law, which is a colorable federal defense for purposes of Section 1442. *Sawyer*, 860 F.3d at 257–58; *Ripley*, 841 F.3d at 209–10. At the removal stage, Polymarket US need not prove that the defense will ultimately prevail; it need only show that the defense is colorable. *Sawyer*, 860 F.3d at 257–58; *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969).

56. Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not municipal regulators, to determine whether event contracts involve "gaming" and whether such contracts may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). The Third Circuit has held that the CEA "preempts state laws that directly interfere with swaps traded on [contract markets]," and that sports-related event contracts traded on a CFTC-licensed contract market are "swaps" subject to the CFTC's exclusive jurisdiction. *Flaherty*, 172 F.4th at 226–28.

57. That defense is more than colorable. The CFTC itself has filed lawsuits and amicus briefs to protect its exclusive jurisdiction over event contracts traded on CFTC-designated contract markets. It has explained that state efforts to regulate or prohibit such markets "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets" and threaten the uniform national framework Congress created. CFTC Arizona Compl. ¶¶ 6–7, 63; *see* CFTC Sixth Cir. Amicus Br. at 1–2; Amicus Br. of the CFTC at 1–2, 17–18, 28, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2; Complaint ¶¶ 6–7, 66, *United States*

*v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. 1; Complaint ¶¶ 5–6, 67, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. 1; *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26 (Apr. 2, 2026). Federal courts have agreed in materially similar cases. *See Flaherty*, 172 F.4th at 226–28; *United States v. Minnesota*, 2026 WL 2150211, at *14; *Johnson*, 2026 WL 1223373, at *5–8; *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7–10 (M.D. Tenn. Feb. 19, 2026).

58. Congress enacted that exclusive federal scheme to ensure that market participants are regulated "under the oversight of the Commission," 7 U.S.C. § 5(b), and not by a fragmented set of state agencies. *See Curran*, 456 U.S. at 386; *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" are preempted by the CEA). Plaintiff's attempt to impose municipal gambling, sports-wagering, licensing, consumer-protection, nuisance, or similar laws on Polymarket US's federally designated exchange directly conflicts with that scheme.

59. "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407. Consistent with that purpose, the Fourth Circuit recognizes that Section 1442 provides "a federal forum for a federal defense." *Ripley*, 841 F.3d at 210. That federal forum protects against the precise danger presented here: state-court proceedings that interfere with the CFTC's administration of the CEA and undermine the federal regulatory scheme.

60. This case exemplifies the danger federal officer removal was designed to prevent. The City of Baltimore seeks an injunction barring Polymarket US from offering event contracts on its federally regulated designated contract market to Baltimore residents. That fractures

national derivatives markets and undermines the uniformity Congress sought to achieve through "a system of effective self-regulation of trading facilities . . . under the oversight of the [CFTC]." 7 U.S.C. § 5(b). Congress enacted federal officer removal precisely to "protect the Federal Government" and those "'who lawfully assist'" it from such "interference with [their] operations." *Watson*, 551 U.S. at 150–51 (citation omitted).

61. This Court can and should recognize its jurisdiction under Section 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

**THIRD GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

62. This case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law. *See* 28 U.S.C. § 1331.

63. Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

64. Plaintiff's claims necessarily require proof that the event contracts at issue are illegal sports wagering—and those claims cannot be adjudicated without deciding disputed and substantial questions of federal law.

65. Polymarket US operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the CFTC. The core question is whether the City of Baltimore may nonetheless impose its municipal ordinance regime on Polymarket US's federally licensed derivatives exchange. But that question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

66. Plaintiff brings claims under the Baltimore CPO for "deceptive" and "unfair and abusive" trade practices, each of which incorporates the Maryland Consumer Protection Act's definitions of those terms. Compl. ¶¶ 91–93, 103–05 (citing Baltimore City Code Art. 2, §§ 4-1, 4-2; Md. Code Ann., Com. Law §§ 13-105, 13-301). Both claims are premised on Plaintiff's theory that event contracts are illegal: either Polymarket US falsely represented that its "sports-event contracts available through the Polymarket platform may lawfully be purchased and traded in Maryland," Compl. ¶ 95, or Polymarket US is engaged in the "unauthorized offering and facilitation of sports wagering," *id.* ¶ 107. Thus, each claim independently requires Plaintiff to prove that Polymarket US's event contracts constitute illegal, unlicensed, "sports wagering" rather than lawful transactions. Each claim therefore independently raises disputed and substantial questions of federal law.

67. ***First***, in its deceptive-practices claim, Plaintiff alleges that Polymarket US conveyed "the false, deceptive, and misleading impression that the sports-event contracts available through the Polymarket platform may lawfully be purchased and traded in Maryland." Compl. ¶ 95; *see also id.* ¶¶ 9, 70–73, 96. But a representation that Polymarket US's event contracts are lawful is only "false" or "misleading" if those contracts are, in fact, unlawful. The illegality of Polymarket US's event contracts is therefore an essential predicate of Plaintiff's first claim for relief.

68. Under municipal law, Plaintiff must prove that Polymarket US's event contracts are illegal sports wagers, as opposed to legitimate transactions, to succeed on its claim. Maryland has long recognized "a broad and well-recognized distinction between a gambling contract and a speculative contract for the purchase and sale of stocks [or commodities] on margin. Such transactions are valid." *Richter v. Poe*, 71 A. 420, 422 (Md. 1908) (affirming dismissal of claim

that contract amounted to gambling). Further, "the law presumes the validity of . . . contracts and the burden of proof to show that they [are] mere gambling contracts is upon" the party asserting that a contract constitutes gambling. *Kahn v. Schleisner*, 166 A. 435, 439 (Md. 1933); *see also Richter*, 71 A. at 422–23 (same); *Dryden v. Zell & Merceret*, 65 A. 33, 33 (Md. 1906) (same).

69. That burden necessarily requires Plaintiff to contend with federal law. Determining whether Polymarket US's event contracts are lawful trading or instead illegal "sports wagering" requires an inquiry into both state and federal law. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution.").

70. Under Maryland law, "[i]t is now generally accepted that the parties to a contract may agree as to the law which will govern their transactions, *even as to issues going to the validity of the contract,*" "such as whether the contract is illegal." *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 618 (2007) (emphasis in original) (quoting *Kronovet v. Lipchin*, 288 Md. 30, 43 (1980)); *id.* at 620 (quoting Restatement (Second) of Conflict of Laws § 187). "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [Maryland] law alone," but rather "depends on whether the challenged event contracts are unlawful under the law governing their validity." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026).

71. Here, the law governing the validity of Polymarket US's event contracts is the CEA, which defines "swap" broadly, 7 U.S.C. § 1a(47)(A), and vests the CFTC with "exclusive jurisdiction" over swap transactions conducted on CFTC-designated exchanges, *id.* § 2(a)(1)(A). Whether Polymarket US's alleged representations of legality were "false" or "misleading," therefore "necessarily depends on the interpretation and application of the CEA and the scope of

the CFTC's exclusive jurisdiction." *Ga. Gambling*, 2026 WL 279375, at *3; *see also Wells v. Chevy Chase Bank, F.S.B.*, 377 Md. 197, 226 (2003) (contracting parties cannot "elect to have state law govern over federal law" (quotation marks and emphasis omitted)) (quoting *Chaires v. Chevy Chase Bank*, 131 Md. App. 64, 79 (2000)).

72. ***Second***, Plaintiff's unfair-and-abusive-practices claim requires proving that Polymarket US's activities amount to "unauthorized offering and facilitation of sports wagering" in Baltimore, Compl. ¶¶ 107–11, such that its event contracts are unenforceable as against "public policy," *id.* ¶¶ 106, 111; *see also* Compl. Demand for Relief ¶¶ (c)–(d) (seeking disgorgement and restitution). That showing likewise requires application of federal law to prove that Polymarket US's event contracts are unlawful under the law governing their validity.

73. "Maryland public policy concerning the enforceability of gambling debts and contracts largely depends on whether the type of gambling engaged in is legal or illegal," *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 394 (1988), and "[p]ublic policy is not determinable by mere reference to the laws of the forum alone," *id.* at 396 (internal quotation marks omitted). Thus, in *Kramer*, the Supreme Court of Maryland (formerly the Maryland Court of Appeals) held that a gambling contract was lawful and enforceable because it was not contrary to public policy where made, even though the contract would have been illegal if made under Maryland law. *Id.* at 398. Accordingly, as with its deceptive practices claims, whether Polymarket US's event contracts are "unauthorized" and therefore contrary to "established public policy," Compl. ¶¶ 106–07, 111, "necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction," *Ga. Gambling*, 2026 WL 279375, at *3.

74. Plaintiff *concedes* that whether its challenged "wagers" are instead lawful "swaps" under the CEA is necessarily part of its claim: The Complaint alleges that "[a] wager on the

outcome of a sporting event is not a 'swap' as defined in 7 U.S.C.A. § 1a(47)(A)(ii)." Compl. ¶ 54; *see also id.* ¶ 59 ("A wager on the outcome of a parlay is not a 'swap' as defined in 7 U.S.C.A. § 1a(47)(A)(ii)."), ¶ 61 ("A wager on the outcome of a proposition bet is not a 'swap' as defined in 7 U.S.C.A. § 1a(47)(A)(ii)."). The Complaint likewise alleges that the CEA "expresses no intent to interfere with or preempt state or local regulation of sports wagering," Compl. ¶ 69, and that the CFTC lacks "exclusive jurisdiction over the sports wagers offered on [designated contract markets]," *id.* ¶ 68. Those are substantial and disputed federal issues for a federal court to decide.

75. Allowing a state court to adjudicate the legality of—and enjoin the trading of—federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these markets. The CFTC said as much just a few months ago. *See, e.g.*, CFTC Sixth Cir. Amicus Br. at 2 (noting State's "jurisdictional overreach" could "imperil[]" the CFTC's "longstanding jurisdiction" over event contracts and that issues "may extend to other forms of derivatives trading"). Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

## <u>ALL REMOVAL REQUIREMENTS ARE MET</u>

76. Based on the foregoing facts and allegations, this Court has jurisdiction over this action because it involves a controversy that exceeds the sum of seventy-five thousand dollars ($75,000) and because Plaintiff and all Defendants are citizens of different states.

77. Based on the foregoing facts and allegations, this Court has jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

78. Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint arises under and necessarily raises substantial, disputed federal questions that belong in a federal court.

79. Venue is proper in this Court because the United States District Court for the District of Maryland is the federal judicial district embracing the Circuit Court for Baltimore City, where Plaintiff originally commenced the state court action. 28 U.S.C. §§ 1441(a), 1446(a).

80. Removal is timely because Polymarket US has not yet been served, meaning it necessarily has not been more than 30 days since service of Plaintiff's Complaint. 28 U.S.C. §§ 1446(b)(1), (2)(B).

81. A copy of Plaintiff's Complaint is attached hereto at Exhibit 1, along with the Case Information Report as Exhibit 2, the Request for Summons as Exhibit 3, the Writs of Summons for all Defendants as Exhibit 4, and the state court action docket sheet as Exhibit 5, which collectively comprise the entire state court file. 28 U.S.C. § 1446(a); Local Rule 103.5(a).

82. Polymarket US will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Circuit Court for Baltimore City. The Notice of Filing of Notice of Removal to be filed with the Circuit Court for Baltimore City is attached at Exhibit 6. 28 U.S.C. § 1446(d).

83. By filing this Notice of Removal, Polymarket US does not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Polymarket US reserves all of its defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Complaint.

## CONCLUSION

84. Polymarket US hereby removes this action and respectfully requests that the Court retain jurisdiction for all further proceedings in this matter.

Dated: August 17, 2026

Respectfully submitted,

/s/ Tonya Kelly Cronin
Tonya Kelly Cronin (Bar No. 27166)
Alison C. Schurick (Bar No. 19770)
Michael A. Brown (Bar No. 20814)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
100 Light Street, 34th Floor
Baltimore, MD 21202
Telephone: 410.862.1049
tykelly@bakerdonelson.com
aschurick@bakerdonelson.com
mbrown@bakerdonelson.com

Orin Snyder*
Matt Benjamin*
Rachel Jackson*
Amanda LeSavage*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Applications for pro hac vice admission forthcoming*

*Attorneys for Defendant QCX LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, I electronically filed the foregoing document (including exhibits) via CM/ECF, and that the foregoing documents were subsequently served upon the following person(s) via email and Certified Mail:

Ebony M. Thompson
Sara Gross
Thomas P. G. Webb
Baltimore City Law Department
City Hall, Room 101
100 North Holliday Street
Baltimore, MD 21202
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov
thomas.webb@baltimorecity.gov

Adam J. Levitt
Daniel R. Ferri
Joseph Nelson
Andrea Shang
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
jnelson@dicellolevitt.com
ashang@dicellolevitt.com

*Attorneys for Plaintiff*

*/s/ Tonya Kelly Cronin*
Tonya Kelly Cronin