E-FILED; Baltimore City Circuit Court
Docket: 8/13/2026 9:23 AM; Submission: 8/13/2026 9:23 AM
Envelope: 27786025

**IN THE CIRCUIT COURT FOR**
**BALTIMORE CITY**

CITY OF BALTIMORE, *ex rel.* Ebony Thompson,

*Plaintiff*,

v.

QCX LLC,
BLOCKRATIZE INC.,
and
QC TECH LLC,

*Defendants*.

Case No. C-24-CV-26-005535

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, the City of Baltimore ("Baltimore," or "the City"), by and through its City Solicitor, Ebony Thompson of the Baltimore City Law Department ("Plaintiff"), brings this suit against Defendants QCX LLC, Blockratize Inc., and QC Tech LLC (collectively, "Polymarket"), and in support thereof states as follows:

## INTRODUCTION

1. Following the Supreme Court's ruling in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458, 486 (2018), which paved the way for States to regulate sports gambling on their own terms, the prevalence of online sports gambling has increased exponentially. A 2025 poll found that 22% of Americans and almost half of men ages 18 to 49 have at least one active online sports-betting account.[1]

2. Seeking to capture a piece of this growing market, Defendants joined the online

[1] Stephanie Pappas, *The New Prediction-Driven Gambling Boom*, Monitor on Psych. (July 1, 2026), https://www.apa.org/monitor/2026/07-08/prediction-driven-gambling-mobile-betting-apps.

sports gambling marketplace. Defendants, through their websites and apps, have solicited wagers from Baltimoreans on a wide range of sporting events. Defendants have offered wagers on the outcome of those events, as well as in-game wagering, proposition bets, and parlays.

3. Defendants have offered sports wagering through the Polymarket platform. While Defendants call the Polymarket platform a "prediction market," the platform plainly facilitates "sports wagering" as defined under Maryland law. Md. Code Ann., State Gov't § 9-1E-01(j).

4. Sports wagering on so-called "prediction markets," like the Polymarket platform, is accounting for an increasingly large share of the online sports gambling market. For example, it was recently estimated that "prediction markets" accounted for around 27% of all legal US sports-betting volume during the World Cup.[2]

5. While Maryland permits online sports wagering, it does so pursuant to a detailed licensing, oversight, and taxation regime. For example, under Maryland law, online gambling is restricted to those aged twenty-one and older.[3]

6. Defendants operate in complete disregard of Maryland's gambling regime; permitting, for example, eighteen-year-olds to bet on sports on the Polymarket platform.[4]

7. Operating in disregard of Maryland's gambling regime, Defendants provide none of the increased tax revenue that licensed gambling provides. Nor do they generate local jobs or business revenue, unlike Baltimore's physical casino.

8. Defendants, rather, are a drain on the City of Baltimore. The vast majority of

---

[2] Nathaniel Popper & Chloe Cresswell, *Prediction Markets Swell to 27% of Sports Bets During World Cup*, Bloomberg (July 19, 2026, 8:30 AM CDT), https://www.bloomberg.com/news/articles/2026-07-19/prediction-markets-swell-to-27-of-sports-bets-during-world-cup.

[3] Md. Code Regs. 36.10.13.44 ("Sports wagering by an individual younger than 21 years old is prohibited.").

[4] *Terms of Use*, Polymarket.com (effective July 17, 2026), https://polymarket.com/tos.

gamblers on the Polymarket platform lose money, largely because they are competing against sophisticated, well-funded, professional bettors that have unique access to betting models and data.[5] Indeed, a recent study of the Polymarket platform found that more than 70% of all trading gains go to the top .04 percent of users.[6]

9. Defendants have deceptively represented that their sports wagers are lawful in Baltimore and have unfairly disregarded Maryland's gambling laws to the detriment of thousands of Baltimore consumers. For these reasons, and for those set forth below, Defendants have violated Baltimore's Consumer Protection Ordinance.

## JURISDICTION

10. This Court has personal jurisdiction over Defendants because they purposefully directed their activities toward Maryland and Baltimore by advertising and offering sports-wagering products to Maryland residents, accepting real-money transactions from Maryland residents, and conducting business within Maryland through their prediction-market platforms. Defendants have intentionally made their platforms available to Baltimore consumers and have derived revenue from transactions involving Baltimore residents.

11. Defendants have transacted business within the State and caused injury within the State arising from the conduct alleged herein, rendering them subject to the specific personal jurisdiction of Maryland courts pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103. ("A court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply goods, food, services, or manufactured products in the State; (3) Causes tortious injury in the State by an

[5] Anas Hassan, *70% of Polymarket Traders Lost Money as Top 0.04% Captured Most Profits: Data*, Yahoo Fin. (Dec. 29, 2025), https://finance.yahoo.com/news/70-polymarket-traders-lost-money-192327162.html.

[6] *Id*.

act or omission in the State[.]").

12. This Court's exercise of personal jurisdiction over Defendants is consistent with due process, as Defendants purposefully directed their gambling platforms into the State of Maryland and the City of Baltimore and otherwise availed themselves of the benefits and protections of the laws of the State of Maryland and the City of Baltimore.

13. This Court has subject matter jurisdiction because the claims at issue arise under a City of Baltimore ordinance. Md. Code Ann., Cts. & Jud. Proc. § 1-501 ("The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil . . . cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law[.]"); Baltimore City Code Art. 2, § 4-5(d) ("In addition to any other enforcement action authorized by law, the City Solicitor, on behalf of the Mayor and City Council, may initiate a legal proceeding for injunctive relief and for the imposition and collection of civil penalties in a court of competent jurisdiction for a violation of this subtitle.").

## VENUE

14. Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. § 6-201, because a substantial part of the acts or omissions giving rise to the claims occurred in the City of Baltimore. Md. Code Ann., Cts. & Jud. Proc. § 6-201 ("[A] civil action shall be brought in a county where the defendant . . . carries on a regular business[.]").

## PARTIES

15. Plaintiff is the City of Baltimore, by Ebony Thompson, the City Solicitor of the Baltimore City Law Department, who has the statutory authority to enforce laws for the protection of the public. Baltimore City Charter art. 7, §§ 22–24,

16. Defendant QCX LLC ("QCX") is a Delaware limited liability company with its principal place of business in New York, New York. In concert with the other Defendants, QCX has advertised and operated an online sports betting operation in the state of Maryland without the licensing approval of the Maryland Lottery and Gaming Control Commission ("MLGCA") and the Maryland Sports Wagering Application Review Commission. Specifically, QCX has operated a so-called "prediction market" through which residents of Maryland can engage in unlicensed sports wagering. This market is an online trading platform through which users may wager on the likelihood of a sports-related outcome. QCX has conducted business across the United States, including within Maryland and Baltimore, where QCX has made sports wagering available to residents, marketed sports wagering to residents, and accepted payments through widely used financial systems accessible by Maryland and Baltimore consumers. QCX has earned revenue, directly or as a transferee, from the fees paid by Baltimore users betting on the Polymarket platform.

17. Defendant Blockratize Inc. ("Blockratize") is a Delaware corporation with its principal place of business in New York, New York. Blockratize is the parent company of QCX and has acted in concert with the other Polymarket entities to advertise and operate the Polymarket sports wagering platform in Maryland. Blockratize has earned revenue, directly or as a transferee, from the fees paid by Maryland users betting on the Polymarket platform.

18. Defendant QC Tech LLC ("QC Tech") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. Upon information and belief, QC Tech has operated the website and apps through which users access the Polymarket sports wagering platform. QC Tech has operated in concert with the other Polymarket entities to operate the

Polymarket sports wagering platform in Maryland. QC Tech has earned revenue, directly or as a transferee, from the fees paid by Baltimore users betting on the Polymarket platform.

## FACTUAL ALLEGATIONS

### I. THE LEGISLATIVE AND REGULATORY FRAMEWORK FOR LEGAL SPORTS WAGERING IN THE STATE OF MARYLAND.

19. In 2018, the United States Supreme Court held that the Professional and Amateur Sports Protection Act was "incompatible with the system of 'dual sovereignty' embodied in the Constitution," paving the way for states to authorize sports wagering on their own terms. *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 458, 486 (2018).

20. Following that decision, Maryland voters approved sports wagering through a statewide referendum, and the Maryland General Assembly subsequently enacted a comprehensive statutory and regulatory framework governing sports wagering within the State.[7]

21. Maryland did not legalize sports wagering without restrictions. Instead, it established a detailed licensing, oversight, consumer-protection, and taxation regime administered by the Maryland Lottery and Gaming Control Commission ("MLGCA") and the Maryland Sports Wagering Application Review Commission.

22. Under Maryland law, a gaming activity is unlawful unless expressly authorized by Maryland law. The MLGCA is charged with determining whether gaming activity is operating legally within the State.

23. Maryland law defines "sports wagering" broadly as "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under bets, moneyline bets, pools, exchange wagering, in-game

[7] Ryan Dickstein, *Timeline: Maryland's Road to Legalized Online Sports Betting*, WMAR-2 News (Nov. 22, 2022, updated Nov. 23, 2022), https://www.wmar2news.com/timelineonlinesportsbetting.

wagering, in-play bets, proposition bets, and straight bets." Md. Code Ann., State Gov't § 9-1E-01(j).

24. Maryland law defines "exchange wagering," as a wager in which one bettor wagers with or against another bettor through a licensed sports wagering operator. COMAR 36.10.01.02B(24). The Maryland General Assembly therefore anticipated and expressly regulated wagering formats in which participants take opposite sides of a sporting-event outcome.

25. Sports wagering may be offered in Maryland only by entities that hold sports-wagering licenses issued by the Commission. Md. Code Ann., State Gov't § 9-1E-03(b). The Commission maintains and publishes a list of licensed sports wagering operators authorized to conduct business in Maryland.

26. The Commission is responsible for ensuring that sports wagering is conducted legally, honestly, and in accordance with Maryland law, and for accounting for wagering proceeds and tax revenues generated by licensed operators.

**A. Licensing Requirements for Sports Wagering in Maryland.**

27. To obtain and maintain authorization to conduct sports wagering in Maryland, operators must satisfy extensive licensing, suitability, integrity, auditing, and compliance requirements imposed by statute and regulation.

28. Licensed Maryland sportsbooks are subject to ongoing regulatory oversight, including internal-control requirements, reporting obligations, audit standards, anti-money-laundering procedures, and disciplinary oversight by the Commission.

29. Maryland also requires licensed sports wagering operators to implement responsible-gaming measures designed to protect consumers from gambling-related harm.

30. Maryland's sports-wagering framework includes age restrictions, licensing standards, responsible-gaming requirements, and regulatory oversight intended to safeguard

Maryland consumers and promote wagering integrity.

**B. Revenues From Authorized Sports Wagering.**

31. Baltimore derives substantial public revenue and benefits from locally licensed sports wagering.

32. Maryland has authorized casino gaming only at a limited number of licensed facilities operating under extensive state oversight, including Horseshoe Casino Baltimore in Baltimore City. In addition to being subject to regulatory requirements designed to protect consumers, licensed Maryland and Baltimore gambling facilities provide benefits to Baltimore residents and businesses, including employment opportunities, local vendor revenue, tax payments to the City, and funding for local community programs.

33. For instance, Horseshoe Casino Baltimore has reported contributing more than $1 billion in gaming tax revenues during its first decade of operation, generating tens of millions of dollars annually for Baltimore City, and employing predominantly Baltimore City and Baltimore County residents.[8] This not only also provides additional income tax revenue to the City, the casino also generates tax income from non-gambling activities, like restaurants and events.

34. Maryland Lottery and Gaming reported that regulated gaming revenues support the local communities and jurisdictions in which casinos are located; small, minority- and women-owned businesses; and the state's Education Trust Fund. These are among the public benefits generated by the state's regulated gaming framework.[9] Defendants' unlicensed sports-wagering

[8] Joe Tyrrell, Regional Vice President for Government Relations, Caesars Entertainment, Testimony in Support of S.B. 603 Before the Maryland Senate Budget and Taxation Committee (2024), https://mgaleg.maryland.gov/cmte_testimony/2024/bat/1VfB1Rr3nlwyZzWVcKJy60GfNcOhnVghb.pdf.

[9] Maryland Lottery and Gaming, *Maryland Casinos Generate $148.5 Million in Gaming Revenue During February '26* (Mar. 5, 2026), https://www.mdgaming.com/maryland-casinos-generate-148-5-million-in-gaming-revenue-during-february-26/.

activities undermine the regulatory structure and deprive the City of tax revenues generated by lawful sports wagering.

35. Maryland law also provides that winnings from unclaimed sports-wagering prizes become property of the State and must be distributed to the Problem Gambling Fund, which supports problem-gambling education, prevention, and treatment efforts. By operating outside of Maryland's licensing and regulatory framework, Defendants have profited from wagering activity conducted by Maryland consumers without contributing to Maryland's efforts to prevent and address gambling-related harms.[10]

36. Defendants' unlicensed sports-wagering activities undermine this regulatory structure and deprive the City of tax revenues generated by lawful sports wagering. Defendants operate outside the mandatory licensing and taxation framework while offering products to Baltimore residents that function as sports wagers.

## II. DEFENDANTS HAVE OFFERED UNLICENSED SPORTS WAGERING IN BALTIMORE THROUGH THEIR PREDICTION MARKET PLATFORMS.

37. Defendants are not licensed sports wagering operators in Maryland.

38. Defendants do not hold sports wagering licenses issued by the Maryland Lottery and Gaming Control Commission ("MLGCA"), nor are they otherwise authorized under Maryland law to offer or conduct sports wagering in Maryland.

39. The MLGCA publishes and maintains the State's list of licensed mobile sports wagering and sports wagering facility licensees. None of the Defendants appear on that list. The Commission has expressly stated that sports wagering may be legally conducted in Maryland only by licensed operators.

---

[10] Md. Code Ann., State Gov't § 9-1E-12(c).

40. Despite lacking a Maryland sports wagering license, Defendants have offered, facilitated, and profited from contracts based on the outcomes of sporting events for Baltimore residents and visitors.

### A. Defendants Have Offered and Profited from Prediction Market Platforms in Baltimore.

41. Through the Polymarket website and mobile application, Defendants have operated what they refer to as "prediction markets," through which they have encouraged, facilitated, and allowed Baltimore consumers to place bets on the outcomes of a wide variety of events, including on the outcome of sporting events. Defendants refer to the wagers placed on the Polymarket platform as "event contracts."

42. Polymarket has charged a probability-based fee model for sports betting. Under this structure, Polymarket's fees are the highest at around 50% probability and decrease as the event outcome becomes more certain. In other words, fees approach zero when the probability is at 0% or 100%.



43. Accordingly, Polymarket's fees on sports event contracts peak at 0.75% when the event's probability is at 50%.[11]

44. In addition, Polymarket has recently created an in-house team to serve as market makers.[12] According to Polymarket, its market makers are "essential to Polymarket's ecosystem" because they provide liquidity for Polymarket's prediction market.[13] Through its market makers, Polymarket has taken opposing positions, absorbed imbalances in bettor demand, and profited from price movements. In this way, Polymarket functions much like a traditional sportsbook, where users effectively trade against the house rather than other bettors.

**B. Defendants' Sports Event-Contracts Are Wagers.**

45. "Event contracts" are investment instruments that ensure payment to a contract holder if a particular event happens, and they have existed in the United States since at least the nineteenth century.[14] These contracts were originally developed by commodity traders as a straightforward way of hedging their investments in raw materials, like timber and grain. By purchasing an event contract for an adverse event, like a flood or fire during the harvest season, commodity traders could offset the losses from that year's poor yield.

46. Defendants, however, have repurposed the event contract to allow consumers to wager on the outcomes of a wide range of real-world and imminent (or already ongoing) events, such as when the United States and Iran will enter a permanent peace deal or whether the Federal

---

[11] *Fees*, POLYMARKET, https://docs.polymarket.com/trading/fees#sports.

[12] *See* Oliver Knight, *Polymarket Hiring In-House Team to Trade Against Customers – Here's Why It's a Risk*, COINDESK (Dec. 5, 2025, 4:34 AM), https://www.coindesk.com/business/2025/12/05/polymarket-hiring-in-house-team-to-trade-against-customers-here-s-why-it-s-a-risk.

[13] POLYMARKET, *Market Makers Overview*, https://docs.polymarket.com/market-makers/overview.

[14] Peter Gratton, *Event Contracts: What They Are and How They Are Used*, INVESTOPEDIA (Mar. 18, 2025), https://www.investopedia.com/events-contracts-8601422.

Reserve will change interest rates.[15]




47. Polymarket has even allowed users to bet on the fates of the U.S. pilots who were shot down in Iran.[16]

48. Event contracts are structured as binary options: bettors buy "Yes" or "No" positions on whether an event will occur ("Yes") or will not occur ("No"). This probability is expressed as a percentage, ranging from 0% (certain to not happen) to 100% (certain to happen). This percentage corresponds to a monetary value, as the combined investment of "Yes" and "No" users must equal $1.00.[17]

49. As more bettors purchase the "Yes" option in an event contract, the perceived likelihood of that outcome increases and the "Yes" contract price also increases. Conversely, if more bettors purchase the "No" option, the contract price of the "No" contracts would increase.

50. A substantial portion of the bets placed on Polymarket are wagers on sporting

---

[15] *Politics*, POLYMARKET, https://polymarket.com/politics.

[16] Rhian Lubin, *Polymarket pulls bet on fate of US pilot missing in Iran amid uproar: "Dystopian death market"*, YAHOO! NEWS (Apr. 4, 2026, 3:52 PM), https://www.yahoo.com/news/articles/polymarket-pulls-bet-fate-us-205220059.html.

[17] *How are Prices Calculated?*, POLYMARKET, https://help.polymarket.com/en/articles/13364488-how-are-prices-calculated.

events.

51. Polymarket has employed a variety of classic sports-betting products, including moneylines, spreads, point totals, and prop bets. These offerings do not exist independent of the sports betting industry and relate to nothing except ways to gamble on sports.

52. As exemplified by Polymarket's website,[18] it has offered moneylines, spreads, and totals relating to sporting events.




[18] POLYMARKET, *United States v. Australia*, https://polymarket.com/sports/world-cup/fifwc-usa-aus-2026-06-19.

53. Polymarket has also offered in-game wagering where users can place bets on the outcome of sporting events while they are in progress.




54. A wager on the outcome of a sporting event is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

55. In addition, Polymarket has offered parlays on its platform.

56. Parlays are a common and popular type of sports gambling wager that allow the bettor to combine multiple bets (or "legs") into one. If all of their selections win, the bettor will receive a larger payout than if they had bet on a single event.

57. Despite the longer odds of winning and the more complicated calculation for odds of success, a recent Washington Post article on sports betting makes clear that, quite simply, "America is obsessed with parlays."[19] Indeed, more than 70% of NFL and NBA bets on FanDuel came from parlays in 2023, according to FanDuel's parent company Flutter Entertainment.

[19] Emily Giambalvo, Kati Perry, and Aaron Steckelberg, *Americans Can't Stop Betting Parlays. Sportsbooks are Cashing In*, THE WASHINGTON POST (October 9, 2025), *https://www.washingtonpost.com/sports/interactive/2025/parlay-popularity-odds-sportsbooks/?itid=sr_0_73aac7bf-f36c-4046-9eec-663be16f2d43*.

58. To capitalize on the popularity of sports parlays, Polymarket, as demonstrated through the screenshot below, has offered "combos" that allow users to trade custom combinations of events. While the combos come with higher payouts if all outcomes are correct, the bettor loses everything if any outcome is wrong.




59. A wager on the outcome of a parlay is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

60. Polymarket, as exemplified by the following from the Polymarket website, has also offered proposition bets, which are wagers placed on specific occurrences within a game, such as individual player statistics, not just the final score or outcome.




61. A wager on the outcome of a proposition bet is not a "swap" as defined in 7 U.S.C.A. § 1a(47)(A)(ii).

**C. Defendants' Sporting Event Contracts Constitute Sports Wagering Under Maryland Law.**

62. Defendants' sporting event contracts constitute "sports wagering" under Maryland law because they involve the business of accepting wagers on sporting events. Maryland defines "sports wagering" as "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets." Md. Code Ann., State Gov't § 9-1E-01(j)

63. Through their prediction-market platform, Defendants permit users to risk money on uncertain sporting-event outcomes, including the outcomes of individual games, championships, and player performances. Users who correctly predict those outcomes receive

monetary payouts, while users who predict incorrectly lose the money they risked. Such transactions are wagers on sporting events regardless of the labels Defendants use to describe them.

64. The Maryland Lottery and Gaming Control Commission has concluded that contracts whose value depends on the outcome of sporting events are "indistinguishable from the act of placing a sports wager" because "the outcome of a sporting event is the basis for determining whether payment will be made" to purchasers. The Commission further determined that offering such contracts in Maryland without a sports-wagering license constitutes unauthorized sports wagering under Maryland law.

65. Accordingly, Defendants' sports-event contracts are wagers on uncertain sporting event outcomes, structured and operated in a manner that meets the legal definition of sports wagering under Maryland law.

66. The regulation of gambling enterprises has long been recognized as lying at the core of a state's police power. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state, and legislation prohibiting it, or acts which may tend to or facilitate it, will not be interfered with . . . .").

67. Indeed, Congress has unequivocally stated that "the States should have the primary responsibility for determining what form of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1).

68. Prediction market operators have argued that the Dodd-Frank Act, enacted in response to the 2008 financial crisis, expanded the Commodity Exchange Act so as to grant the

Commodity Future Trading Commission exclusive jurisdiction over the sports wagers offered on their platforms.

69. The Commodity Exchange Act, however, expresses no intent to interfere with or preempt state or local regulation of sports wagering. Further, it is "simply implausible that Congress would silently reverse course" on the longstanding recognition that states have primary responsibility for regulating gambling within their borders "through an Act addressing the 2008 housing financial crisis." *KalshiEx LLC v. Cox*, No. 2:26-cv-00151-RJS-CMR, 2026 WL 2241564, at *10 (D. Utah Aug. 4, 2026) (granting the State of Utah's motion for summary judgment on the issue of whether the Commodity Exchange Act preempts Utah's enforcement of its anti-gambling laws against a prediction market operator).

## III. THROUGH THEIR PLATFORMS AND ADVERTISING, DEFENDANTS HAVE DECEPTIVELY MISREPRESENTED THAT THEY OFFER LEGAL AND AUTHORIZED SPORTS WAGERING.

70. Defendants have marketed sports wagers to people in Baltimore through their websites, mobile apps, advertisements on streaming videos and television (especially during or surrounding sports broadcasts), and through social media platforms.

71. Defendants' advertisements have conveyed the false and misleading impression that they are authorized to offer sports wagering under Maryland law.

72. Polymarket has maintained regular and sports-focused social media accounts that are available to Baltimore residents, including Instagram (@polymarket and @polymarketsports), TikTok (@polymarket and @polymarketsports), and X (@polymarket and @polymarketsports), through which it has conveyed the false and misleading impression that it is authorized to offer sports wagering under Maryland law.

73. Defendants have not disclosed, through their websites or advertisements, that they are not authorized to accept sports wagers under Maryland law.

## IV. DEFENDANTS FAILED TO DISCLOSE THE RISKS OF LOSS ARISING FROM INSIDER TRADING AND PROFESSIONAL TRADERS.

74. Defendants market and operate the Polymarket platform as a place where ordinary consumers can participate in event-based markets and sports wagering against other users. In doing so, Defendants create the misleading impression that consumers are merely trading against other ordinary individuals rather than sophisticated professional traders possessing significant informational, technological, and financial advantages.

75. Defendants have failed to disclose material facts concerning the extent and nature of risks associated with insider trading, manipulation, and trading based on advance knowledge of contract outcomes in the markets offered through their platforms.

76. Many of the contracts offered through Defendants' platforms concern events for which material information may be known in advance by a limited number of people before that information becomes publicly available. Depending on the contract, those persons may include athletes, coaches, team employees, league personnel, broadcasters, entertainers, production staff, campaign personnel, government officials, contractors, vendors, and others possessing advance knowledge concerning the outcome of a contract.

77. Public reports, industry participants, sports leagues, and federal regulators have repeatedly raised concerns regarding insider trading, manipulation, and trading based on advance knowledge of contract outcomes in prediction markets.[20]

---

[20] Dirk van Haaster, *Insider Trading Claims Rock Super Bowl Halftime Markets, Prompt Calls for Action*, DeFi Rate (Feb. 9, 2026, 7:23 AM PDT), https://defirate.com/news/insider-trading-claims-hit-super-bowl-prediction-markets/;

David Purdum, *NFL Asks Prediction Markets to Stop Manipulable Trading*, ESPN (Mar. 30, 2026, 9:00 AM ET), https://www.espn.com/nfl/story/_/id/48338843/nfl-asks-prediction-markets-stop-manipulable-trading;

David I. Miller, Director of Enforcement, Commodity Futures Trading Comm'n, *Remarks at NYU Law School: CFTC Enforcement Priorities, Insider Trading in the Prediction Markets, and Cooperation with the CFTC* (Mar. 31, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opamiller1.

78. Further, one recent analysis found that sophisticated traders on Polymarket often utilize proprietary data feeds, predictive models, algorithmic trading systems, artificial-intelligence tools, and other expensive resources unavailable to ordinary consumers. One firm reportedly spent more than $200,000 annually on data feeds and AI tools used to support prediction-market trading.[21]

79. The same analysis, using research on Polymarket, suggested that the vast majority of people participating in prediction markets lose money, with the profits being captured by the top 0.1 to 1 percent of sophisticated users.[22]

80. The Wall Street Journal's analysis of more than a million Polymarket accounts found that 67 percent of profits go to just 0.1 percent of users, with fewer than 2000 accounts netting almost $500 million since November 2022.[23]

81. Indeed, the evidence suggests that ordinary participants in prediction markets lose *more* money than participants in other forms of gambling, such as sportsbooks or casinos.[24]

82. Leading up to and during the 2026 Super Bowl, traders on Polymarket and other prediction-market platforms publicly identified trading activity that they believed reflected advance knowledge of halftime-show plans. For instance, one trader placed approximately

---

[21] Brad Lipton & Toyosi Odusola, *Since Kalshi's Launch, Ordinary Users Have Lost Half a Billion Dollars*, Roosevelt Inst. (July 7, 2026), https://rooseveltinstitute.org/blog/since-kalshis-launch-ordinary-users-have-lost-half-a-billion-dollars/.

[22] *Id.*

[23] Neil Mehta, Katherine Long & Caitlin Ostroff, *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall St. J. (May 3, 2026, 9:00 PM ET), https://www.wsj.com/finance/investing/polymarket-kalshi-betting-profits-prediction-markets-eb23ac11.

[24] Lipton & Odusola, supra note 20 (further noting that "[p]rediction markets advertise that their platforms are better than traditional gambling because users are betting against each other rather than against a 'house.' But the reality is that ordinary people participating in prediction markets are largely betting against professional traders using sophisticated methods…[t]he key point is that the deck is systematically stacked against everyday users participating in these markets… it isn't clear that everyday participants in prediction markets know how sophisticated the person or the methods on the other side of the transaction are."

$500,000 on Lady Gaga appearing during the halftime show before any public confirmation of her appearance. Public reporting further described accounts that appeared to trade successfully on multiple Super Bowl halftime-show markets before relevant information became publicly available, sparking allegations that the traders possessed advance knowledge of halftime-show plans and performers.[25]

83. The National Football League has also publicly warned that certain prediction-market contracts are particularly susceptible to insider trading and manipulation. In March 2026, the NFL asked prediction-market operators to refrain from offering contracts involving matters that can be known in advance or influenced by individuals connected to the event, including announcer statements, celebrity appearances, draft selections, player signings, and coaching decisions.[26]

84. Federal regulators have likewise recognized insider trading in prediction markets as a significant concern. In March 2026, the Director of Enforcement for the Commodity Futures Trading Commission publicly identified insider trading in prediction markets as an enforcement priority and warned that certain event contracts create heightened risks that persons possessing material nonpublic information may trade against other market participants.[27]

85. An examination by the New York Times identified more than 11,000 Polymarket accounts that exhibited some combination of characteristics associated with inside trading.[28]

---

[25] van Haaster, supra note 46.

[26] Purdum, supra note 46.

[27] Miller, supra note 46.

[28] Stuart A. Thompson & David Yaffe-Bellany, *Dozens of Polymarket Bets Show Signs of Insider Trading, The Times Finds*, N.Y. Times (May 13, 2026, updated May 18, 2026), https://www.nytimes.com/2026/05/13/technology/polymarket-insider-trading.html.

86. Information concerning risks associated with insider trading, manipulation, and advance knowledge of contract outcomes is material to consumers. A reasonable consumer deciding whether to place a wager through Defendants' platforms would consider it important to know that certain contracts may be especially vulnerable to insider trading, manipulation, or trading based on advance knowledge of contract outcomes.

87. A reasonable consumer would also consider it important to know that ordinary users may be trading against sophisticated and professional traders who use proprietary data, predictive models, advanced technology, and other resources unavailable to most consumers, and who capture a disproportionate share of profits on prediction-market platforms.[29]

88. Despite promoting Polymarket as a platform where users are trading against one another rather than against a traditional sportsbook or casino, Defendants have not adequately disclosed the extent to which ordinary consumers may be trading against traders who possess advantages such as access to proprietary data, predictive models, advanced technology, material nonpublic information, and other resources unavailable to ordinary users.

89. Defendants have also not adequately disclosed the extent to which those participants capture a disproportionate share of profits on prediction-market platforms, particularly compared to traditional sportsbooks or casinos.

[29] Lipton & Odusola, supra note 20.

## CLAIMS FOR RELIEF

## COUNT 1

### VIOLATIONS OF BALTIMORE CONSUMER PROTECTION ORDINANCE THROUGH DECEPTIVE TRADE PRACTICES

90. Plaintiff repeats and realleges paragraphs 1-89 of this Complaint as if fully set forth herein.

91. The Baltimore Consumer Protection Ordinance ("CPO") prohibits "unfair, abusive, or deceptive trade practices" in connection with the sale and offer for sale of consumer goods and services. Baltimore City Code Art. 2, § 4-2.

92. The CPO incorporates the Maryland Consumer Protection Act's ("MCPA") definition of "unfair, abusive, or deceptive trade practices." Baltimore City Code Art. 2, § 4-1.

93. The MCPA defines "unfair, abusive, or deceptive trade practices" to include, *inter alia*¸ the following:

- False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;
- Representation that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;
- Representation that a merchant has a sponsorship, approval, status, affiliation, or connection which he does not have;
- Failure to state a material fact if the failure deceives or tends to deceive; and
- Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of any consumer goods, consumer realty, or consumer service.

Md. Code Ann., Com. Law, § 13-301.

94. Defendants QCX LLC, Blockratize Inc., and QC Tech LLC have violated the CPO by engaging in deceptive acts and practices in Baltimore City.

95. Through the Polymarket website, mobile application, advertising, marketing materials, and social-media accounts, Defendants have repeatedly conveyed the false, deceptive, and misleading impression that the sports-event contracts available through the Polymarket platform may lawfully be purchased and traded in Maryland.

96. Through the promotion and facilitation of sports-event contracts to Maryland consumers, Defendants have repeatedly conveyed the false, deceptive, and misleading impression that those products may lawfully be purchased and traded in Maryland, while failing to disclose that Defendants do not hold Maryland sports-wagering licenses and are not authorized to offer sports wagering in Maryland.

97. Defendants have further failed to disclose material facts concerning the extent and nature of risks associated with insider trading, manipulation, trading based on advance knowledge of contract outcomes, the extent to which consumers may be trading against sophisticated participants possessing significant informational, technological, financial, or other advantages.

98. Defendants' omissions had the capacity, tendency, and effect of deceiving and misleading consumers concerning both the legality of Defendants' products and the nature, safety, integrity, and risks of those products.

99. At all times, Defendants' false, deceptive, and misleading conduct has been willful.

100. Plaintiff is entitled to an injunction to prevent Defendants' continued violation of the CPO. Baltimore City Code Art. 2, § 4-5.

101. For each violation of the CPO, and for each day that a violation was committed, Plaintiff is entitled to civil penalties of up to $1,000. Baltimore City Code Art. 2, § 4-4.

**COUNT 2**

**VIOLATIONS OF BALTIMORE CONSUMER PROTECTION ORDINANCE THROUGH UNFAIR AND ABUSIVE TRADE PRACTICES**

102. Plaintiff repeats and realleges paragraphs 1-89 of this Complaint as if fully set forth herein.

103. The Baltimore Consumer Protection Ordinance ("CPO") prohibits "unfair, abusive, or deceptive trade practices" in connection with the sale and offer for sale of consumer goods and services. Baltimore City Code Art. 2, § 4-2.

104. The CPO incorporates the Maryland Consumer Protection Act's ("MCPA") definition of "unfair, abusive, or deceptive trade practices." Baltimore City Code Art. 2, § 4-1.

105. While specific practices are enumerated in the MCPA (and, by extension, the CPO), "[i]t is the intent of the [Maryland] General Assembly that in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act [(15 U.S.C. § 45)] by the Federal Trade Commission and the federal courts." Md. Code Ann., Com. Law § 13-105.

106. The Federal Trade Commission has explained that unfairness under 15 U.S.C. § 45 is determined in part by a consideration of "(1) whether the practice injures consumers," and "(2) whether it violates established public policy."[30]

107. Defendants QCX LLC, Blockratize Inc., and QC Tech LLC have violated the CPO by engaging in unfair and abusive acts and practices in Baltimore City through the unauthorized offering and facilitation of sports wagering.

[30] FTC Policy Statement on Unfairness (Dec. 17, 1980), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness.

108. Through their unauthorized offering and facilitation of sports wagering within Baltimore, Defendants have caused substantial consumer injury in the form of monetary losses.

109. Defendants have obtained an unfair competitive advantage by offering sports-wagering products to Maryland consumers while operating outside Maryland's licensing, regulatory, and consumer-protection framework applicable to licensed sportsbooks.

110. Defendants' unauthorized offering and facilitation of sports wagering within Baltimore is not outweighed by countervailing benefits to consumers or competition.

111. Defendants' unauthorized offering and facilitation of sports wagering within Baltimore is against public policy.

112. Plaintiff is entitled to an injunction to prevent Defendants' continued violation of the CPO. Baltimore City Code Art. 2, § 4-5.

113. For each violation of the CPO, and for each day that a violation was committed, Plaintiff is entitled to civil penalties of up to $1,000. Baltimore City Code Art. 2, § 4-4.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, the City of Baltimore, respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

a. Awarding the maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4-2;

b. Injunctive relief mandating that Defendants cease operating their unauthorized sports wagering platforms in the City of Baltimore and prohibiting them from accepting transactions from Baltimore residents;

c. Disgorgement of ill-gotten gains derived from Defendants' unlawful practices;

d. Restitution to Baltimore consumers harmed by Defendants' unlawful practices; and

e. Awarding such other relief as may be available and appropriate under the law or in equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED: August 13, 2026

Respectfully submitted,

Ebony M. Thompson
City Solicitor

*/s/ Sara Gross*
Sara Gross (0412140305)
Chief, Affirmative Litigation Division
Thomas P. G. Webb
Chief Solicitor
**BALTIMORE CITY**
**LAW DEPARTMENT**
City Hall, Room 101
100 North Holliday Street
Baltimore, Maryland 21202
Tel: (443) 984-3421
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov

Adam J. Levitt*
Daniel R. Ferri*
Joseph Nelson*
Andrea Shang*
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
jnelson@dicellolevitt.com
ashang@dicellolevitt.com

**pro hac vice motions to be filed*

***Counsel for Plaintiff, the City of Baltimore***